UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| PEDRO VELARDE and BLANCA VELARDE, ) | Bankruptcy No. 09 B 32565 |
| Debtor, ) | |
| ) | |
| ─────────────────────────────── ) | |
| HARRIS, N.A., ) | |
| Plaintiff ) | Adversary No. 10 A 00122 |
| v. ) | |
| PEDRO VELARDE, ) | |
| Defendant ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

This Adversary proceeding relates to the Chapter 7 bankruptcy case filed by the Defendant/Debtor Pedro Velarde ("Velarde" or "Defendant" or "Debtor"). His creditor sues under 11 U.S.C. § 523(a)(2)(A) to bar dischargeability of the remaining debt due on a loan used for auto purchase by Debtor.

Following trial, both parties having rested, the following Findings of Fact and Conclusions of Law are made and will be entered. The story that unfolded at trial was unusual. Defendant was asked to help a friend Maximiliano Aguirre Bue ("Bue") buy a car to drive after that friend was refused credit to buy a car. Defendant cannot read or speak English, so although he signed papers as purchaser, he now says that he believed he was merely co-signing for Bue. Under law, one who signs a legal document is usually bound by it whether or not that person read and understood it. However, the issue here is whether this Defendant is not merely liable but also committed a fraud or false pretense in signing as purchaser and user of a vehicle when his intent was not even to use or pay for the car, but rather to turn it over to Bue as he did the same day it was purchased. He later

gave Bue the loan payment coupons received by him from the creditor. Bue made many payments using Defendant's payment coupons. After Bue stopped making payments and disappeared with the car, the Defendant made several payments on the account and dodged questions from the creditor's agents as to location of the vehicle.

On one side of the case lies the question whether Defendant has shown that he was a foolish though honest person who only wanted to help a friend acquire a car and was blocked by ignorance of the English language from understanding what he was signing and therefore lacked intent to defraud or falsely pretend. On the other side lies not only some conduct of Defendant which suggests that he knew more than he admits, but also our system of law and commerce which depends largely on people being held responsible for their signed agreements whether read and understood or not.

Somewhere in the story also lies the role of technology in modern commerce. The creditor here put on credible evidence showing that payments by Bue were made with payment coupons that were read automatically from the coupon bar codes, and no one from the creditor actually looked at the checks paid by Bue, so the creditor did not learn of his role and the curious activity of Debtor for many years.

Our Bankruptcy Court in this District is singularly fortunate to have available a panel of volunteer lawyers who serve pro bono publico to represent pro se debtors in bankruptcy in some matters so as to assist the court and those parties where skilled counsel are needed. In this case Attorney Thayer C. Torgerson was that volunteer counsel. The Court is grateful for his professional work in presenting a defense for Debtor in this case. He served in the best traditions of the law.

## FINDINGS OF FACT

### I. Parties

1. The Plaintiff in this matter is Harris N.A. ("Harris"). It funded a loan to Defendant for a vehicle as described herein below.

2. The Defendant in this matter is Pedro Velarde ("Velarde"). Velarde filed a Chapter 7 proceeding in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, on September 1, 2009.

### II. Factual Background

3. By 2004, Velarde had lived in the United States for the past twenty-four years, operated his own business in Chicago, and had already executed several loan documents in English, including for the purchase of two prior automobiles and one house. Trial Tr. 11/15/10 at 11:18-22, 17:16-18:6, 54:20-56:14, 56:19-60:15; Trial Tr. 11/16/10 at 73:14-74:11.[1]

4. Due to bad credit, Maximiliano Aguirre Bue ("Bue") was denied a loan to purchase a 2005 Ford E-150 Cargo Van, VIN #1FTRE14W45HA25229 (the "Vehicle"), which he sought to purchase. Am. Answer ¶ 9; Stipulation of Facts ¶ 9.

5. Bue then called Velarde and asked him to sign for the Vehicle so that Bue could have a car to use. Trial Tr. 11/15/10 20:6-10, 21:9-14; Am. Answer ¶ 13.

6. Over the telephone, Velarde provided Bue with his Social Security number, his name, his address, and his date of birth to see if he qualified to purchase the Vehicle. Trial Tr. 11/15/10 at 21:1-18.

---

[1] Trial Tr. 11/15/10 at ___" refers to the trial transcript of the November 15, 2010 proceeding. "Trial Tr. 11/16/10 at ___" refers to the trial transcript of the November 16, 2010 proceeding.

- 3 -

7.  Velarde had been acquainted with Bue for about two years prior to purchase of the Vehicle, and saw him two to three times a month during that period. Trial Tr. 11/15/10 at 20:21-25.

8.  After being notified that he was qualified to purchase the Vehicle, Velarde went to Al Piemonte Ford ("Ford") on November 20, 2004. Trial Tr. 11/15/10 at 21:9-22:10.

9.  At Ford, on November 20, 2004, Velarde completed a credit application with Harris in his own name. Velarde signed the credit application identifying himself as sole applicant. Velarde thereby certified the information contained therein was true and complete; however, Velarde omitted pertinent information such as his creditors on his prior automobile loans and home mortgage. Stipulation of Fact ¶¶ 10-12; Joint Ex. C;[2] Trial Tr. 11/15/10 at 9:18-10:9; Trial Ex. 2.[3]

10. Harris approved Velarde for a loan based upon the information contained in his credit application for purchase of the Vehicle. The process in which Harris approved Velarde for a loan is common in the banking industry. Trial Tr. 11/15/10 at 81:22-83:2; Trial Tr. 11/16/10 at 13:3-20; Stipulation of Fact ¶¶ 20-22; Joint Exhibit F; Trial Tr. 11/15/10 at 9:18-10:9.

11. In addition to the credit application, Velarde further signed a bill of sale for the Vehicle that clearly identified himself as purchaser, signed an application in his own name for insurance on the Vehicle, and completed an application for registration and title of the Vehicle in his own name. Stipulation of Facts ¶¶ 13-18, 26-28; Joint Ex. D, E & H; Trial Tr. 11/15/10 at 9:18-10:9, 22:1-6; Trial Ex. 1-2, 6-9.

12. Velarde also executed a Retail Installment Contract and Security Agreement (the "Contract") on November 20, 2004 to consummate Harris's loan to him for purchase of the Vehicle. Stipulation of Facts ¶¶ 2-4; Joint Exhibit A; Trial Tr. 11/15/10 at 9:18-10:9, 22:1-6; Trial Ex. 5.

---

[2] "Joint Ex. _" refers to those Exhibits stipulated to in the parties' Joint Stipulation of Facts.

[3] "Trial Ex. _" refers to Plaintiff's Trial Exhibits, unless otherwise denoted.

13. By virtue of the Contract, Harris has a lien in the Vehicle purchased by Velarde. Stipulation of Facts ¶¶ 5-7; Joint Ex. B.

14. The Contract also expressly provided that Velarde promised to pay to the order of Harris fifty-nine installments of $439.01 each, beginning on December 20, 2004. Stipulation of Facts ¶¶ 2-4; Joint Ex. A; Trial Tr. 11/15/10 at 9:18-10:9, 22:1-6. Trial Ex. 5.

15. The Contract expressly provided further that Velarde would not sell, lease, encumber, or place the Vehicle in any other person's possession without written consent of the holder of the Contract. Stipulation of Facts ¶¶ 2-4; Joint Ex. A; Trial Tr. 11/15/10 at 9:18-10:9, 22:1-6; Trial Ex. 5.

16. The Contract further provided that waiver of any default in the payment of any installment of the total of payments when due would not operate as a waiver of any subsequent default. Stipulation of Facts ¶¶ 2-4; Joint Ex. A; Trial Tr. 11/15/10 at 9:18-10:9, 22:1-6; Trial Ex. 5.

17. The present holder and owner of the Contract is Harris. Amended Answer ¶¶ 2, 5.

18. Velarde executed all of the documents, including the Contract, at Ford without reading the terms and conditions contained therein, without discussing their contents with the Ford agent, and without asking for an explanation of them. Trial Tr. 11/15/10 at 22:20-24:25.

19. Despite not reading the documents that he signed at Ford, Velarde knew that he was at the Ford location to purchase the Vehicle for use by Bue, using Velarde's credit, because Bue did not qualify for the financing. Trial Tr. 11/15/10 at 20:6-10; Am. Answer ¶13.

20. Velarde later registered the Vehicle with the Illinois Secretary of State in his own name affirming that he was the owner. Stipulation of Facts ¶¶ 5-7; 26-28; Joint Ex. B, H; Trial Ex. 14.

21. From 2004 to 2008, Harris sent correspondence to Velarde's home address at 911 N. 2nd Avenue in Maywood, Illinois regarding the loan. Trial Tr. 11/15/10 at 12:2-7, 73:18-22; Trial Ex. 11-13, 18.

22. Before signing the Contract, Velarde had experience in obtaining automobile loans because he previously received loans to purchase cars on at least two prior occasions. In addition, Velarde entered into other credit transactions, such as obtaining a home mortgage, which he has also later refinanced. Velarde signed those documents without reading them. Trial Tr. 11/15/10 at 56:19-60:15; Trial Ex. 3; Stipulation of Facts ¶¶ 23-25.

23. Once Velarde signed all the requisite documents for the Vehicle involved here, the agent at Ford provided him with an envelope containing copies of all the documents that he executed, a receipt to him for the $3,000 cash down payment then made (cash which he says that Bue actually provided), and the keys to the Vehicle. Velarde then handed the envelope and keys to his friend Bue. Trial Tr. 11/15/10 at 27:19-28:17; Trial Tr. 11/16/10 61:25-63:21.

24. Bue never signed any of the documents that Velarde signed at Ford. Trial Tr. 11/15/10 at 54:9-14.

25. Velarde did not have any intention of making payments to Harris on his loan. Rather, Velarde intended that Bue would make all payments on the car loan. Trial Tr. 11/15/10 at 73:12-74:7.

26. Velarde did not have any intention of possessing or using the Vehicle. Trial Tr. 11/15/10 at 28:20-23; Stipulation of Facts ¶ 30-31.

27. After purchasing the Vehicle, Velarde immediately turned over possession of the Vehicle to Bue, and never possessed or used the Vehicle himself. Bue drove the Vehicle away for his personal use. Trial Tr. 11/15/10 at 31:13-16; Stipulation of Facts ¶ 31.

28.  Harris mailed a payment coupon book to Velarde at his home address about two weeks following execution of the Contract. Trial Tr. 11/15/10 at 71:15-73:1, 85:14-86:9; Trial Tr. 11/16/10 43:7-18; Trial Ex. 11, 18.

29.  Harris's payment coupon book instructed Velarde to provide a payment coupon with each payment. Trial Tr. 11/15/10 at 71:15-73:1; Trial Ex. 11, 18.

30.  Velarde immediately provided Bue with the payment coupon book. Trial Tr. 11/15/10 at 71:15-73:1; Trial Tr. 11/16/10 60:11-16; Trial Ex. 11, 18.

31.  For many months thereafter, Bue made payments on Velarde's loan through money orders, using the payment coupons with each of his payments. Trial Tr. 11/15/10 at 90:9-92:7; Trial Tr. 11/16/10 at 42:16-43:6.

32.  To process incoming payments on accounts, Harris uses a remote payment processing center in which a machine automatically sorts payments based upon coding found on payment coupons and applies those payments to Harris's accounts without human review. Trial Tr. 11/15/10 at 86:10-88:16.

33.  The use of the electronic medium for processing payments is a customary practice in the banking industry, and is necessary for Harris to process the 7,000 to 13,000 loan payments that it receives daily. Trial Tr. 11/15/10 at 86:24-87:5; Trial Tr. 11/16/10 at 43:22-44:3.

34.  Harris representatives are not able to view actual images of the incoming payments, unless they specifically request a copy in response to a customer inquiry about the posting of a sent payment or such other similar inquiry made by their debtors. Trial Tr. 11/15/10 at 88:17-89:13, 92:17-25.

35.  From December 2004 through November 2007, thirty-two payments were made on Velarde's loan account. Defendant's Group Ex. 1.

36. Of the thirty-two payments made during that period, twenty-one payments were made by money orders bearing Bue's name. Each of the money orders bearing Bue's name were accompanied by one of the payment coupons that had been provided by Harris, which identified the loan. Payments would not have been applied to Velarde's account without the payment coupons. Bue's name on payment checks was undetected by Harris's electronic processing center because the coupon bar code directed application of payment to the correct account and no employee was required to read a check. Trial Tr.11/15/10 at 90:9-92:7; Trial Tr. 11/16/10 at 42:16-43:6.

37. The remaining eleven payments were made either in the form of cash supplied by Velarde or in Velarde's name. Velarde made these payments after Bue stopped doing so, with the hope of being reimbursed by Bue. Trial Tr. 11/15/10 48:23-49:6, 73:12-74:7.

38. In December 2005, Velarde began to receive traffic tickets in his own name for the Vehicle due to expired license plates. Trial Ex. 15 at 41:23-42:1.

39. Velarde testified that he did not speak with Bue from 2006 until August 2010. Trial Tr. 11/15/10 at 32:3-13.

40. Velarde last saw the Vehicle some time during 2007. Trial Tr. 11/15/10 at 31:19-21.

41. From January 2007 through September 2008, Harris' representative made more than sixty calls to Velarde to inquire as to the status of payments on Velarde's account for the Vehicle purchase; however, most of those calls were not responded to. Trial Tr. 11/15/10 at 94:6-95:17; Trial Ex. 13.

42. During collection calls, Harris's representatives would ask to speak to Velarde, and if a Harris representative made contact with Velarde, the representative would first verify the speaker through personal identifiers, such as his Social Security number, address, and birth date. The

representative would then ask him the reason for the delinquency on the accounts, and request immediate payment. Trial Tr. 11/15/10 at 95:3-97:5.

43. In response to each of the calls between January 2007 and September 2008, Velarde never mentioned that Bue was involved in the transaction, that Velarde did not possess the car, or that he was not the one responsible for payments. He instead informed the Harris representative that there was no problem with the loan account. Trial Tr. 11/15/10 at 67:7-12, 94:6-95:17, 100:13-17, 102:9-13; Trial Ex. 13.

44. Velarde testified that his first payment on the account was on January 12, 2007. He made that payment in response to a collection call by Harris, because Bue had by then stopped paying on the account. Trial Tr. 11/15/10 at 48:15-18.

45. During the January 12, 2007 collection call, in response to the Harris representative's inquiry as to why his account was delinquent, Velarde did not provide a reason for the default. Trial Tr. 11/15/10 at 96:2-7; Trial Ex. 13.

46. Prior to January 12, 2007, Harris had already sent to Velarde at his home address delinquency notices on August 30, 2005, May 1, 2006, January 2, 2007, and January 9, 2007 that identified Velarde as the sole obligor on the account. Following January 12, 2007, Harris also sent Velarde delinquency notices to Velarde's home on January 30, 2007, February 9, 2007, February 20, 2007, and April 27, 2007. Velarde acknowledges receiving delinquency notices at his home, but he never responded by informing Harris that Bue possessed the Vehicle. Trial Tr. 11/15/10 at 73:3-74:7; Trial Ex. 12.

47. Following the January 12, 2007 payment, Velarde recalled making payments personally only on October 1, 2007, October 19, 2007, and November 9, 2007. Payments on the

account were also made in Velarde's name on February 23, 2007, April 27, 2007, July 19, 2007, and September 20, 2007. Am. Answer First Affirmative Defense ¶ 6.

48. Velarde did not make any payments until Harris engaged in substantial collection attempt, and ultimately threatened a lawsuit and asset garnishment. Although he made the foregoing payments, Velarde still did not intend to be responsible for the entire loan. Trial Tr. 11/15/10 at 73:20-74:3; Trial Ex. 12.

49. On April 27, 2007, in response to the Harris representative's inquiry as to why he missed the most recent payment, Velarde did not provide an explanation. Trial Tr. 11/15/10 at 96:8-19; Trial Ex. 13.

50. On July 17, 2007, in response to the Harris representative's inquiry as to why the most recent payment was missed, Velarde explained to a Spanish-speaking representative that it was an oversight. Trial Tr. 11/15/10 at 96:20-97:5; Trial Ex. 13.

51. Velarde never notified Harris that he did not possess the vehicle, that someone else was making payments on the loan, or that he believed that someone else should be responsible for the loan. Trial Tr. 11/15/10 at 54:15-19, 63:8-12, 96:2-97:5, 100:13-17, 102:9-13; Trial Tr. 11/16/10 at 30:11-16; Trial Ex. 13.

52. Harris has procedures in place to help mitigate the damages it might face. If a representative is ever notified that the collateral is not in possession of the account holder, it is Harris's procedure that the representative make a notation on the debtor's account record detailing the conversation and request that the debtor retrieve the vehicle. If the debtor informed the representative that he could not retrieve the automobile, then Harris would attempt its own independent repossession of the automobile. Similarly, if a Harris representative is notified that a third party is making payments on the account, it is Harris's procedure to make a notation on the

account detailing the conversation and reiterate that the Contract makes the debtor individually responsible for the payments. Trial Tr. 11/15/10 at 98:21-100:12, 101:17-102:13.

53. Once Velarde's account became several months delinquent and the many phone calls to Velarde went unreturned, Harris attempted to repossess the Vehicle, but could not locate it. Trial Tr. 11/15/10 at 83:13-84:17, 94:6-95:17; Trial Ex. 13.

54. On May 5, 2008, a Harris agent went to Velarde's home in an attempt to repossess the Vehicle after no payments had been made for six months. The agent made contact with Velarde and inquired as to the whereabouts of the Vehicle. In response to the agent's inquiry, Velarde asserted falsely that his girlfriend had the Vehicle and that he did not know her whereabouts, thereby continuing to hide the fact that Bue possessed the Vehicle. Trial Tr. 11/15/10 at 83:13-84:17, 94:6-95:17; Trial Ex. 13.

55. On September 3, 2008, Harris referred Velarde's account to an attorney to institute a lawsuit for collection. Trial Tr. 11/15/10 at 94:6-95:17; Trial Ex. 13.

56. On September 1, 2009, while Harris's lawsuit against Velarde in the Circuit Court of Cook County, Illinois was pending, Velarde filed for bankruptcy under Chapter 7. Trial Tr. 11/16/10 at 66:3-67:13.

57. In October 2009, during the underlying Chapter 7 bankruptcy proceeding, Harris first learned that Velarde gave Bue possession of the Vehicle. Trial Tr. at 94:6-95:17; see Trial Ex. 13.

58. In his Chapter 7 bankruptcy petition, Velarde failed to list Harris as a creditor and did not schedule Harris's lawsuit against him. Trial Tr. 11/16/10 at 66:3-72:10.

59. Velarde does not know the present location of the Vehicle, and the last time he saw the Vehicle was in 2007 when by chance he encountered Bue's son driving it. Trial Tr. 11/15/10 at 31:19-21.

60. Velarde did not prior to trial of this proceeding amend his Chapter 7 bankruptcy petition to list Harris as a creditor or its lawsuit, even after Harris's participation in the Bankruptcy Rule 341 Meeting of Creditors showed that Harris was pursuing its rights to the Vehicle and Velarde's debt to it. Trial Tr. 11/16/10 at 66:3-67:13.

61. The Vehicle still has not been located. Trial Tr. 11/15/10 at 83:13-84:17; Stipulation of Facts ¶¶ 37, 62. The principal balance due on the loan from Harris used to purchase the Vehicle is $9,966.11. Plaintiff also sought recovery for finance charges, interest, later fees and attorney's fees, but did not present evidence as to those matters at trial or since.

## CONCLUSIONS OF LAW

### III. Jurisdiction and Venue

This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b), being an Adversary proceeding to determine dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A). Venue lies in this district under 28 U.S.C. § 1409.

### IV. Legal Standard Under 11 U.S.C. § 523(a)(2)(A)

In order to prove a case for false pretenses or false representation under § 523(a)(2)(A), a creditor must prove that: (1) the debtor obtained funds through representations that the debtor knew to be false, or made with such reckless disregard for the truth as to constitute willful misrepresentations; (2) the debtor intended to deceive the creditor; and (3) the creditor justifiably relied on the debtor's misrepresentation to its detriment. In re Dobek,,278 B.R. 496, 504 (Bankr. N.D. Ill. 2002) (citing Mayer v. Spanel Int'l, Ltd., 51 F.3d 670, 673 (7th Cir. 1995)). A false representation need not be an overt oral or written lie, but may be established by conduct showing that the debtor intended deliberately to create or foster a false impression. Id.

When a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. In re Anzelone, 2004 Bankr. LEXIS 231, No. 02 B 11190, 02 A 00817 at *11 (Bankr. N.D. Ill. Mar. 25, 2003) (citing Glucona America, Inc. v Ardisson, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001).) Whether Velarde had intent to deceive is measured by his subjective intention at the time that he misrepresented his role in the transaction. Dobek, 278 B.R. at 507.

> "[Justifiable reliance] is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Justifiability is not without some limits, however . . . [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."

Field v. Mans, 516 U.S. 59, 71 (1995) (quoting Restatement (2d) of Torts § 545A cmt. b, § 541 cmt. a).

## V.   Harris Met its Burden Under § 523(a)(2)(A) to Bar Velarde's Debt from Dischargeability.

Velarde made express written misrepresentations in the Contract that he promised to make payments to Harris on the loan and that he would maintain possession of the Vehicle. Velarde's intent to deceive is shown because he knew that Bue could not purchase the Vehicle due to bad credit, that he had no intentions of making payments on the loan, and that he had no intentions of possessing the Vehicle for his own use. Velarde's intent to deceive is also manifested by his recklessly executing the Contract and the credit application without reading it or making any inquiry to the terms and conditions of the loan. By knowing from his experience in prior purchases of cars for himself that the Contract and credit application had representations as to who would use and pay

for the car and through his continued intentional concealment of the facts from Harris during his many conversations with Harris representatives, Velarde corroborated his intent to deceive Harris.

Harris justifiably relied upon Velarde's representations and extended credit to Velardo based only upon his credit application as the sole applicant, his promise to make payments on the loan, and his promise to keep the Vehicle in his possession. Had Harris known that Bue, who was unqualified to obtain a loan from Harris due to his bad credit, would be in possession of the Vehicle and would be responsible for making payments on the loan, Harris would not have entered into the transaction. Examination of Velarde's representations in the documents did not and could not reveal the true nature of his intent in the transaction.

**VI.   Harris did not Waive it Rights.**

Waiver is defined as the intentional relinquishment of a known right. In re Krueger, 192 F.3d 733, 739 (7th Cir. 1999). A party claiming waiver has the burden of proving at trial that the creditor knew of its rights and those facts which evidenced an intention to waive such rights. Id. Implied waiver of a legal right must be proved by clear, unequivocal, and decisive act of the party who is alleged to have committed waiver. Id. A party asserting a waiver defense cannot mislead a party or hide the nonperformance. See Batterman v. Consumers Ill. Water Co., 634 N.E.2d 1235, 1237 (Ill. App. t. 1994).

Velarde did not show that Harris knowingly accepted payments from Bue with the intention to waive its rights to demand payments from Velarde. Indeed, Velarde's conduct tended to conceal Bue's involvement in the transaction when he provided Bue with the payment coupon book, so that Bue's payments would be applied to Velarde's account.

**VII.   Defendant's Defenses Are Not Persuasive.**

(a)   <u>Material Misrepresentation</u>

The representation that Defendant would be making payments and would be operating the car was certainly material, both on the face of the contract and by any logic. A vehicle that serves as security for a loan is not sold and the loan not given without concern as to who will drive it and pay for it. Entrusting security to a responsible person is an obvious protection for the secured creditor.

Lack of an action by creditor to treat Debtor as being in default for many months is not a defense. Actually that delay was caused by Debtor making payments for a time after Bue stopped paying, part of the scheme to hide the original deception from Harris. After Bue disappeared with the car and Debtor could not make payments, the effect and cost of the deception was ultimately learned during Debtor's bankruptcy.

As to whether a hypothetical creditor would waive its claim or be estopped from pursuing a debtor if it had for some time known of and accepted payments from a third party is not at issue here because this creditor had no such knowledge. See <u>In re Baptiste</u>, 439 B.R. 507, 511-12 (Bankr. N.D. Ill. 2010).

Harris' system for recording payments was set up to reject third party payments on loans. For a payment to be applied to a loan, the incoming payment must either be in the loan obligor's name or be accompanied by a payment coupon. In this case the payment coupon was relied on when Bue and then Debtor sent in payments. The evidence did not establish that Harris ever learned that payments by Bue with payment coupons did not come from Debtor.

(b)    <u>Debtor had intent to deceive</u>

Debtor argues that he had no intent to deceive because while bound by a contract he could not read, he could not intend to lie in signing an agreement he could not read. However, the complete evidence shows that he knew that he was buying a car for use by his friend and understood that the transaction was in his name.

First, he went to the car dealer because he knew that the friend was not approved for the necessary loan. Second, he was indifferent to what the papers said when he signed them, and therefore he did not bring or ask anyone to translate. Third, the coupon book came to him at his house and he turned it over to Bue. Fourth, he registered the vehicle in Illinois as the owner. Fifth, when the friend disappeared and stopped making payments, Velarde made many months of payments on the account without reporting disappearance of the car to Harris. Sixth, he had on two prior occasions purchased cars himself with financing and was familiar with that type of transaction. Seventh, when Harris agents called him, he repeatedly lied and covered up.

Viewing events as a whole, his arguments about absence of understanding and intent are not persuasive.

The argument that the salesman deceived him is also without merit because he admitted that the salesman asked no question of him and he asked no question of that person.

The argument that he believed himself to be a co-signer because he saw Bue sign the credit application is not true. At trial he said that he never saw Bue sign the credit application. Moreover, the credit application did not include Bue's signature, but only Bue's printed name.

While he denied at trial learning that he was the vehicle owner until the year 2009, he admitted that Harris sent several demands for payment to him by August of 2005. Indeed he

attempted to transfer registration of the vehicle to Bue in 2006. Therefore, he knew for years prior to 2009 that he was the owner.

While testifying that he did not see the payment coupon book until 2006, he admitted giving to Bue mail received from Harris soon after the loan and sale transaction, and admitted that he may have received the coupon book shortly after the transaction. In fact that admission explains how Bue received the coupon book that had been mailed to Debtor.

## VIII. The Doctrine of Laches Does Not Apply Here.

Laches bars a party's rights when the party has unreasonably delayed in their assertion so as to cause prejudice to the opposing party. Anderson v. Board of Regents, 140 F.3d 706-07 (7th Cir. 1998). However, there can be no defense of laches where delay is caused by fraud or concealment. Central R. Signal Co. v. Longden, 194 F.2d 310, 320 (7th Cir. 1952); see also Highway Ins. Co. v. Korman, 190 N.E.2d 124, 131 (Ill. App. Ct. 1963); Hot Wax, Inc. v. Turtle Wax, Inc., 27 F. Supp. 2d 1043, 1051 (N.D. Ill. 1998). Where both parties contribute to delay in enforcement of a party's rights, laches is inapplicable. Baylie v. Swift & Co., 670 N.E.2d 772, 780 (Ill. App. Ct. 1996). Here, Harris did not know that Velarde was not in possession of the Vehicle and not making payments on the loan because Velarde concealed Bue's role in the transaction. After continuous attempts at obtaining a payment from Velarde and repossessing the Vehicle, Harris commenced litigation against Velarde within nine months of Velarde's last payment on the loan. Accordingly, laches is not applicable here as a defense.

## IX. Harris is Not Barred by Limitations.

The statute of limitations was pleaded as an affirmative defense. The applicable statute of limitations to pursue a fraud count is five years under Illinois law. 735 Ill. Comp. Stat. 5/13-205; Litton v. Barrington Realty Co., 653 N.E.2d 20 1276, 1278 (Ill. App. Ct. 1995). The statute of

limitations to pursue a breach of contract case on a written contract is ten years. 735 Ill. Comp. Stat. 5/13-206.

Velarde was not in default as to contract payments until after November 2007. On September 1, 2009, Velarde filed a Chapter 7 bankruptcy proceeding that halted any further collection activities. Harris did not learn that Velarde gave the Vehicle to a third party until the Meeting of Creditors in the underlying bankruptcy proceeding occurred in October of 2009.

Harris did not learn that Bue had made many payments on this loan until Velarde filed his Answer in this proceeding.

Harris promptly pursued a cause of action alleging a fraud count in January of 2010 once it learned of its rights. Since this action lies under a contract entered into November 20, 2004, the five year period of limitations for a fraud action might have expired November 20, 2009, two months before this action was filed. Since fraud is the gist of this action to bar dischargeability of debt, and this is not simply an action to recover the debt due from Velarde, the action might then have been barred by limitation statute of the five years.

However, under the "discovery rule," commencement of a limitations period is delayed until a potential plaintiff learns or should have learned about a defendant's fraud. Harbach v. Kaczmarek, 288 F.3d 969, 973 (7th Cir. 2002). Since the fraud in this case was not and could not have been discovered by Plaintiff within five years after the contract was executed (and, indeed, Debtor's acts of deception continued until the post-bankruptcy creditors meeting), the action here is not barred by limitations.

## CONCLUSION

Plaintiff's counsel will therefore be asked to present a proposed Judgment Order finding that the debt for $9,966.11, plus court costs is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

Since Plaintiff rested without presenting evidence of additional charges, interest, late fees, and attorney's fees that it sought in this Adversary proceeding, there can be no recovery for those parts of its claim. In cases seeking these types of recoveries, the court might upon pretrial motion agree to defer such evidence until main issues are decided. Absent an order permitting that (which was never sought or allowed here), all issues in litigation must be addressed with trial evidence before a plaintiff rests. Since they were not, the foregoing judgment to be entered will be complete and final.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this _____ day of June 2011.